**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LATANYA LYNN JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:18-cv-02413 |
| v. | ) | |
| | ) | Judge Charles P. Kocoras |
| HUMANA, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF
MATERIAL FACTS TO WHICH THERE IS NO GENUINE DISPUTE**

Defendant HUMANA INSURANCE COMPANY (referred to as "Humana" or "the Company"), incorrectly named as Humana, by and through its undersigned attorneys, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, files this Statement of Material Facts to Which There Is No Genuine Dispute in Support of its Motion for Summary Judgment.

## I. PARTIES

1. Plaintiff LaTanya Lynn Jackson ("Jackson") is an individual who, at all relevant times, resided in Cook County, Illinois, and who was employed by Humana from approximately July 21, 2014 to May 16, 2016. *See* Complaint, ECF No. 11, ¶¶1, 4-5; Answer to Amended Complaint, ECF No. 18, ¶¶1, 4-5; **Exhibit A**, 11:13-19; 17:23-24; 18:8-19:13; 284:4-286:7 – Deposition of LaTanya Lynn Jackson ("Jackson Dep."). Humana is a health service company that offers a diverse line of health and supplemental insurance products and services to serve all types of consumers. **Exhibit B**, Declaration of Chelsea Bjarnarson ("Bjarnarson Dec."), ¶3.

## II. VENUE AND JURISDICTION

2. On April 4, 2018, the Clerk of Court received Jackson's Complaint but it was not filed by the Clerk of Court until September 5, 2018. *See* Complaint, ECF Nos. 1 and 11. As received, Jackson's Complaint alleged claims of age discrimination and disability discrimination,

including disparate treatment, failure to accommodate and retaliation. *See* Complaint, ECF No. 1, ¶¶9, 12. Jackson maintains that her disability is anxiety. Ex. A, 300:3-5.

3.       On September 5, 2018, the Court entered an Order dismissing Plaintiff's age discrimination claim, without prejudice, for failure to state a claim because it was "gravely insufficient even when read with the liberal interpretation afforded to *pro se* litigants." *See* Order, ECF No. 6. At no time did Plaintiff amend her Complaint to replead an age discrimination claim.

4.       Jurisdiction and venue is proper in this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. §1391, 42 U.S.C. § 12101, *et seq.* *See* Complaint, ECF No. 11, ¶11.

## III.    FACTS

### A.    Humana's Policies

5.       Humana maintains a number of employment policies of which Jackson acknowledged she was aware and that were available to her via Humana's intranet. Ex. A, 21:22-24:13. Humana does not tolerate any type of harassment or discrimination, including harassment or discrimination based on factors protected by federal, state or local law. Ex. A, 24:17-26:20; *see* **Group Exhibit C**, Exs. 2-4 to Jackson Dep. (Associate Acknowledgement; Non-Discrimination; Harassment). Humana provides employees with many ways to raise a concern in the workplace. Employees may report harassment to their supervisors/managers, they may call or email the toll-free Ethics Help Line/HR4U, or they can contact Human Resources or Associate Relations. Humana prohibits retaliation. *Id.* When a concern is raised, Humana promptly investigates.

6.       Humana also has a policy setting forth the procedures for requesting accommodations under the Americans with Disabilities Act ("ADA"). Ex. A, 27:6-28:20; *see* **Exhibit D**, Ex. 5 to Jackson Dep. Under this policy, employees and managers are encouraged to engage in an informal, interactive dialogue. Ex. C. An employee requesting an accommodation

2

must fill out an Accommodation Request form.  *Id.*  Humana will interact with employees to see if a reasonable accommodation can be provided.  *Id.*

### B.  Jackson's Employment with Humana

7.      Jackson began working at Humana on or about July 21, 2014.  Ex. A, 17:23-24; 18:8-19:13; Ex. B, ¶4.  Jackson worked in the Vitality Call Ops department at Humana's office located in Chicago, Illinois.  *See* Complaint, ECF No. 11, ¶3; Answer to Amended Complaint, ECF No. 18, ¶3; Ex. B, ¶4.  Throughout her tenure with Humana, Jackson held the position of Customer Care Specialist.  Ex. A, 19:2-13.

8.      As a Customer Care Specialist, Jackson worked in a call center setting.  Ex. A, 28:24-30:18; **Exhibit E**, Ex. 6 to Jackson Dep; Ex. B, 6.  Prior to her employment with Humana, Jackson had 25 years of call center experience.  Ex. A, 30:19-31:1.

9.      As a Customer Care Specialist with Humana, Jackson's responsibilities included but were not limited to: engaging with HumanaVitality members to motivate and encourage them; providing members with guidance on transactions, troubleshooting, and complaints; educating members about products and services; and interacting with members respectfully.  *Id.*; Ex. E; Ex. B, ¶6.  Jackson was also expected to meet established expectations and take responsibility for achieving results.  *Id.*

10.     Throughout her tenure, Jackson performed her duties from Humana's location in downtown Chicago.  Ex. A, 32:6-11; Ex. B, ¶7.  For approximately her first year of employment, Jackson reported directly to Chelsea Bjarnarson, Manager, who physically worked in Green Bay, Wisconsin.  Ex. A, 32:13-33:4; Ex. B, 7  Jackson's communications with Ms. Bjarnarson were primarily either via e-mail, phone or Skype.  Ex. A, 33:5-7; Ex. B, 7.

11.     The majority of 2015 to approximately February 2016, Jackson reported directly to Abbey Bernath, Frontline Leader, who, like Jackson, was located in Chicago.  Ex. A, 34:2-16: Ex.

B, ¶8.  In approximately February 2016, Jackson began reporting directly to Jennifer Stoltenberg, Frontline Leader, who was located in Wisconsin.  Ex. A, 35:13-36:6; Ex. B, ¶8.  Both Ms. Bernath and Ms. Stoltenberg reported to Ms. Bjarnarson.  Ex. B, ¶8.

12.     According to Jackson, Humana began managing her performance the "second we hit the floor" after training at the end of August/early September 2014, when she was told she was not keeping up with the team.  Ex. A, 210:9-19; 211:16-212:4; 213:20-214:13; 215:4-11.  Humana gave Jackson side-by-side support to help her transition from training and, according to Jackson, her side-by-side assistant told her that her problem was that she was "just slow."  Ex. A, 106:8-107:16.  Jackson contends that from then on, Humana continued to talk to her about her performance throughout her employment.  Ex. A, 215:12-19.  Jackson maintains that she started complaining to her managers about being treated differently than her teammates as soon as she was told she was not keeping up.  *Id*.

### a.     Jackson is counseled about her attendance

13.     On August 12, 2015, Ms. Bernath sent Jackson an email in which she noted that within a rolling six-month period, Jackson had four unscheduled absences/occurrences – which was considered excessive under Humana's attendance policy.  Ex. A, 39:6-41:12; **Exhibit F**, Ex. 7 to Jackson Dep.  Ms. Bernath warned Jackson that if she had another unscheduled absence or tardy by October 2, 2015, she would receive a more formal coaching plan, which could include being placed on a CCIP (Continuous Coaching Improvement Plan).  *Id*.

14.     The following day, Jackson spoke with Ms. Bernath and asked her why she felt Jackson's absences were excessive.  Ex. A, 41:13-42:14; 44:11-45:3.  According to Jackson, Ms. Bernath responded that she felt Jackson's absences were excessive because she had more absences that her other teammates.  Ex. A, 42:15-20.  Jackson told Ms. Bernath she was discriminating against her by comparing her absences to the absences of other teammates.  Ex. A, 43:1-2.  When

4

Ms. Bernath asked Jackson why she felt she was being discriminated against, Jackson explained

to her that one of her absences was the result of her having a colonoscopy. Ex. A, 43:3-5. Jackson

reiterated to Ms. Bernath that she felt she was being discriminated against in being compared to

her co-workers instead of against the attendance policy and Ms. Bernath told her she was being

compared against the attendance policy. Ex. A, 43:9-20. Ms. Bernath also told Jackson that

attendance emails went out to everyone on the team. Ex. A, 57:1-11.

15.     During this conversation, Ms. Bernath also told Jackson that she may be able to use

FMLA for medical appointments, which Jackson felt was sarcasm. Ex. A, 46:1-47:12. According

to Jackson, she did not have a serious illness, so she would not have been able to get FMLA.

Ex. A, 47:13-18. Jackson did not think it was fair that Ms. Bernath would enforce the attendance

policy and not excuse absences that were for medical reasons. Ex. A, 46:19-47:18.

16.     On August 13, 2015, Jackson placed a phone call to the HR hotline ("HR4U") and

spoke to Bridget Hilger in order to obtain some feedback or clarity on the attendance policy. Ex. A,

48:13-53:6; **Exhibit G**, Ex. 8 to Jackson Dep. According to Jackson, Ms. Hilger told her that HR

only becomes involved in attendance issues when a supervisor raises it to HR and that the

supervisor has the discretion to enforce or not enforce the attendance policy. Ex. A, 51:7-52:7.

Ms. Hilger advised Jackson that any unscheduled time off would count against absences under the

policy regardless of the reason. Ex. A, 52:20-23; Ex. 8.

**b.     On December 21, 2015, Jackson is counseled about phone manipulation**

17.     On December 21, 2015, Ms. Bernath coached Jackson for call handling issues.

Ex. B, ¶9; *see* HIC000577-HIC000578 attached to Bjarnarson Dec. Through regular and routine

call monitoring, Ms. Bernath found multiple calls where Jackson had routed a member

unnecessarily back into the queue. *Id*. She also found a call where Jackson had left a member on

hold for 29 minutes and Ms. Bernath spoke to Jackson about such holds as well as holds at the

beginning of her calls.  *Id*.  Routing calls back into the queue and leaving members on hold for extended periods of time is considered phone manipulation and/or call avoidance, and is not appropriate conduct. *Id*.

        **c.**     **On January 15, 2016, Jackson contacts HR4U about her attendance**

18.     On January 15, 2016, Jackson contacted HR4U asking whether if a request for a half-day off to attend an "urgent care" medical appointment was denied, would it be counted against her for attendance purposes if she went to the appointment.  Ex. A, 71:7-72:24: **Exhibit H**, Ex. 10 to Jackson Dep.  According to Jackson, she was experiencing an eye infection and had been referred to a specialist the following day but her request to attend the specialist appointment was denied by Ms. Bernath because the business anticipated heavy calls that day.  Ex. A, 73:23-76:23. Jackson responded to being told that her request was denied by stating that she was going to the doctor and she did not want to have an attendance occurrence assessed.  Ex. A, 76:24-77.  Ms. Bernath informed Jackson that she would receive an occurrence if she did not show up for work. Ex. A, 77:4-5.

19.     In response, Jackson contacted HR4U.  Ex. A, 77:4-7.  According to Jackson, Paulette Daniel, Human Resources, responded to her HR4U concern and told her that company policy was she would receive an occurrence but that her supervisor had discretion to not enforce the policy.  Ex. A, 77:4-78:9.  However, on January 15, 2016, Ms. Daniel emailed Jackson a copy of the company's attendance policy, noting that attendance rules are both company-wide and departmental, with the departments having the flexibility to define the number of absences or occurrences that would lead to disciplinary action.  **Exhibit I**, Ex. 11 to Jackson Dep., at HIC001506.  Jackson ended up not receiving an occurrence because she was able to reschedule her appointment to outside of her work hours.  Ex. A, 77:20-24.

20.     Jackson felt that Ms. Bernath was harassing her by denying her request to attend a doctor's appointment and telling her that she would receive an attendance occurrence if she went to the appointment instead of reporting to work.  Ex. A, 78:13-79:13.

> **d.     On January 29, 2016, Jackson has side-by-side coaching and is also counseled about her performance**

21.     On January 29, 2016, Kari Ahrens, a team lead, and Jackson had a side-by-side session.  Ex. A, 115:21-117:16; **Exhibit J**, Ex. 12 to Jackson Dep.  After the side-by-side, Ms. Ahrens sent Jackson notes recapping the session, which included some positive observations of Jackson's work as well as some opportunities for improvement.  Ex. A, 117:17-118:5; Ex. J, at HIC000457-HIC000458.  Thereafter, Jackson sent the notes back to Ms. Ahrens and included additional thoughts on her feeling extremely stressed and consistently feeling that she was being compared and judged to other teammates.  *Id.*

22.     On January 29, 2016, Ms. Bernath sent Jackson an email regarding her after-call work ("ACW"), noting that her average ACW for the month was high, between approximately four and six minutes, and needed to be closer to the team expectation of 120 seconds.  Ex. A, 80:13-85:3; Ex. I, at HIC001509-HIC1510.  ACW is the time spent after ending a call with a customer where a Customer Service Specialist is unavailable to take another phone call while noting in the computer system the work that was just done with the customer.  *Id.*

23.     Jackson was aware that the team expectation for ACW was 120 seconds.  *Id.*  Jackson has no knowledge of whether Ms. Bernath also spoke to other teammates about their ACW time or what their performance weaknesses were.  Ex. A, 86:15-18.

> **e.     On January 29 and 30, 2016, Jackson discloses her anxiety diagnosis and asserts that she is being harassed and discriminated against**

24.     Jackson responded to Ms. Bernath's email on January 29, 2016, by stating that she would do her best to reduce her ACW.  Ex. A, 99:18-100:7; Ex. B, ¶11; Ex. I, at HIC001506-

001507.  Jackson further stated that her stress level was at an all-time high and she was being treated for anxiety disorder.  Ex. A, 100:2-15; Ex. B, ¶11; Ex. I, at HIC001506-001507.  Jackson continued by stating:

> [T]he style of management and attendance policy is too much stress, and has very negative under tones [sic] and shows no humanity. I understand the Humana Rules, however, the way it's being enforced creates an unhealthy atmosphere. I feel that [sic] have never had a calm fair chance in this setting since day one after training, and now I am exhausted.
> - I feel there are levels of harassment against me.
> - I feel there are levels of discrimination against me.
> - I feel that I am being denied my human rights to work and earn a living and be productive in a healthy work environment.
> - I feel that I am working in a hostile environment that triggers anxiety and fear of job loss.
> - Lastly, this is my real feelings on the last 15 months with HumanaVitality, my hopes are to resolve this internally and not have to escalate to Human Resources or EEOC.
>
> Without going to [sic] deep into my personal issues with the workplace structure and my mental status I am going to leave this with the emails below showing this behavior started early and continues today based on the feedback and last review."

Ex. A, 103:21-105:3; Ex. I, at HIC001506-001507.  Jackson forwarded this mail to Ms. Bjarnarson, Ms. Stoltenberg, Ms. Bernath, Ms. Ahrens, and Mr. Worzala (a team lead) on January 30, 2016.  Ex. B, ¶11; Ex. I.

25.    Jackson then cut and pasted an email dated September 5, 2014, that she sent to Ms. Bernath, Ms. Bjarnarson, Ms. Stoltenberg and Mr. Worzala regarding her post-training transition and expectations.  Ex. A, 105:7-12; Ex. J, at HIC001507-HIC001508.  In the email, Jackson expressed that she felt that she was being viewed as the weakest link and stated that she was overwhelmed and wanted to express her concerns, fears and anxiety, and ask for additional consideration.  Ex. A, 108:11-16; Ex. J, at HIC001507-HIC001508.  Jackson agrees that she was

not informing Humana in this email that she had been diagnosed with anxiety.  Ex. A, 108:17-109:5.

26.     To her January 29, 2016 email to Ms. Bernath, Jackson next cut and pasted an email she had sent to Mr. Worzala on November 19, 2014.  Ex. A, 109:13-17; Ex. J, at HIC001508-HIC001509.  Jackson stated in this email, "[T]his is not the 1st email with abrasive under tones [sic] and negative gestures." and "I am being compared unfairly to the rest of the group and labeled as a slow learner when we all learn different."  Ex. A, 110:2-3; 113:8-19; Ex. J, at HIC001508-HIC001509.  While Jackson did not forward Mr. Worzala the email she was referencing, she testified at her deposition that Mr. Worzala had sent her an IM (instant message) asking her if she needed help because her phone code was in an unknown status or ACW status.  Ex. A, 110:7-18.  Jackson explained to him that she was in ACW status because she was upset after Ms. Bernath had approached her work station and critiqued her on how she interacted with a member on a call.  Ex. A, 110:19-112:2.  Jackson felt that Ms. Bernath's attitude with her was "like she's tired of telling me something."  Ex. A, 112:8-17.  Jackson also felt that Ms. Bernath used negative gestures towards, her like flipping her hair.  Ex. A, 112:18-22.  Jackson felt that Ms. Bernath wanted to educate her with an attitude rather than helping her to understand.  Ex. A, 113:8-19.

27.     In addition to her email to Ms. Bernath on January 29, 2016, on January 30, 2016, Jackson emailed Ms. Bjarnarson, Ms. Stoltenberg, Ms. Bernath, Ms. Ahrens and Mr. Worzala.  Ex. A, 86:23-88:5; Ex. B, ¶10; Ex. I, at HIC001505-HIC001506.  In this email, Jackson reveals she is taking action to get her anxiety stabilized, she was diagnosed with "acute stress disorder" that week and that she is pursuing protections under the "Americans with Disability Federal Law."  *Id.*.  Prior to the January 29 and January 30 emails, Jackson had not informed her supervisors of having any diagnosis of anxiety.  Ex. A, 87:6-88:5; Ex. B, ¶12.

28.     In her January 30 email, Jackson states, "I understand the job duties and department rules but I am struggling with the style of management and I am starting to feel this practice is effecting [sic] my overall mental health."  Ex. A, 89:8-20; Ex. J.  Jackson further stated, "I don't feel that I can continue the pressure of being constantly compared to others and labelled as insufficient based on the teams [sic] performance and not my own performance and growth as a Calls Only Rep."  *Id*.  Jackson then listed examples of when she felt she was compared to others and labelled insufficient, including being told that she was not taking her lunch and breaks at her scheduled time; being told her ACW and AHT levels were high; being told she was not doing stretch assignments or volunteering; and being told she would receive disciplinary action if she received another attendance occurrence.  Ex. J.

29.     According to Jackson, earlier in the week in which she sent this email, Ms. Bernath told her that she was not in compliance with taking her lunch and breaks on time.  Ex. A, 89:23-91:12.  Jackson felt Ms. Bernath was harassing her because "it was just always this attitude" after Jackson told Ms. Bernath in December 2015 (after being counseled about her attendance) that she [Jackson] felt she was being harassed.  Ex. A, 91:13-20.  Jackson felt Ms. Bernath was harassing her because Ms. Bernath was comparing her to people that were younger than her.  Ex. A, 91:21-92:8.  Jackson felt that Ms. Bernath had no right to compare her to the team because she had a different lifestyle and personal issues.  Ex. A, 91:23-92:12.

30.     Jackson maintains that she would "constantly say 'That's not fair'" to Ms. Bernath when Ms. Bernath compared her to younger teammates.  Jackson said that when Ms. Bernath compared her to other teammates, she asked Ms. Bernath, "Do you understand that's discrimination?" and Ms. Bernath responded, "No.  I have every right to compare you to the team."  Ex. A, 92:8-12.  Jackson maintains that she responded by saying, "You didn't say, 'When I hired

10

you, you have to keep up with the 30-year-olds or else I'm going to keep harassing you, saying, keep up, keep up, keep up'." Ex. A, 92:8-17.

31.     Jackson felt that Humana could not compare her to other teammates for performance and that she could only be compared against the rules and the procedures for the role. Ex. A, 92:18-22.  Even if there was a rule that said Jackson needed to take her breaks and lunch at a certain time, Jackson felt Ms. Bernath did not have the right to tell her if she was out of compliance because Jackson was not in control of when calls would come through and she could not end calls in order to take a break.  Ex. A, 92:23-18.  Jackson felt that Ms. Bernath nitpicked about the breaks and lunch times.  *Id.*  Jackson does not know if Ms. Bernath spoke to anyone else about their break and lunch time compliance.  Ex. A, 93:18-21.

### f.     On February 1, 2016, Humana notifies Jackson that she will be transferred to Ms. Stoltenberg's supervision

32.     On February 1, 2016, Ms. Bjarnarson responded to Jackson's email stating that she appreciated Jackson bringing her concerns to leadership's attention and that she would review the circumstances and come back with a plan of action.  Ex. A, 114:9-19; Ex. B, ¶13; Ex. I, at HIC001505.  Thereafter, Jackson asked to be transferred from Ms. Bernath's supervision and her request was granted.  Ex. A, 114:20-115:17; Ex. B, ¶14.

33.     On February 11, 2016, Ms. Bjarnarson sent Jackson an email following up on a telephone conversation they had on February 8, 2016.  Ex. A, 118:9-119:12; Ex. B, ¶¶14-15; **Exhibit K**, Ex. 13 to Jackson Dep.  Ms. Bjarnarson confirmed that Jackson would change leaders from Ms. Bernath to Ms. Stoltenberg as soon as the team was realigned due to a new hire class coming onboard.  Ex. A, 119:25-120:1; Ex. B, ¶¶14-15; Ex. K, at HIC000510-HIC000511.

34.     In the February 11 email, Ms. Bjarnarson confirmed that Jackson would continue to have one-on-one coaching sessions but those would also be transferred from Ms. Bernath to Ms.

Stoltenberg. Ex. A, 121:21-122:15; Ex. B, ¶¶14-15; Ex. K, at HIC000510-HIC000511. Ms. Bjarnarson confirmed that she would handle any coaching conversation with Jackson until assigned to Ms. Stoltenberg. Ex. A, 122:16-22; Ex. B, ¶¶14-15. Ms. Bjarnarson further confirmed that Jackson was still expected to meet department metrics and was still required to follow Humana's attendance policy, which Jackson understood. Ex. A, 122:23-123:12; Ex. B, ¶¶14-15; Ex. K, at HIC000510-HIC000511. Finally, Ms. Bjarnarson encouraged Jackson to apply for FMLA and to also let leaders know when she needed time off the phone, when she required help, or when she was struggling with anything so that leaders could help. Ex. A, 123:22-124:8; Ex. B, ¶¶14-15; Ex. K, at HIC000510-HIC000511.

35.     On February 12, 2016, Jackson responded to Ms. Bjarnarson's email, noting that she had read it and agreed with it. Ex. A, 124:9-19; Ex. B, ¶16; Ex. K, at HIC000510. Jackson further noted that she was in the process of pursuing FMLA, but had yet to connect with her physician and therapist to do so. Ex. A, 124:20-125:1; Ex. B, ¶16; Ex. K, at HIC000510. Ms. Bjarnarson acknowledged receipt of Jackson's email on the same day. Ex. A, 125:22-126:2; Ex. B, ¶16; Ex. K, at HIC000509.

### g.     Jackson maintains Ms. Bernath continued to harass her prior to her transfer to Ms. Stoltenberg when Ms. Bernath talked to her about FMLA

36.     Jackson felt that Ms. Bernath continued to harass her by approaching her prior to her transfer to Ms. Stoltenberg to remind her that even if her FMLA was approved, she would need to meet Humana's performance expectations when she transferred to Ms. Stoltenberg. Ex. A, 146:21-149:14. Jackson acknowledges that she confirmed with Ms. Stoltenberg that she had asked Ms. Bernath to have that conversation with her because Ms. Bernath was in the same office as Jackson. *Id.* Jackson maintains that Ms. Stoltenberg "became part of the problem" because she should not have sent Ms. Bernath – her "trigger" – to talk with her. *Id.*

37.    Jackson maintains that Ms. Bernath told her that FMLA protected her attendance but not her performance.  Ex. A, 149:15-150:13.  Jackson did not agree and asked Ms. Bernath, "What's the purpose of FMLA then?  If I could perform, then I don't need FMLA."  Ex. A, 150:14-21.  Jackson told Ms. Bernath that "there was no reason for me to fill out FMLA if I'm going to still also be held to this number and this productivity and this and that."  Ex. A, 150:22-151:1.

38.    Via a letter dated March 1, 2016, Unum, Humana's third-party administrator, informed Jackson that she had been approved to use FMLA intermittently from February 17, 2016 through August 16, 2016.  Ex. A, 309:24-310:20 **Exhibit L**, Ex. 34 to Jackson Dep.

> **h.    Jackson shares her "backstory" with Ms. Stoltenberg and expresses her desire for a "fresh start"**

39.    On February 26, 2016, Jackson sent Ms. Stoltenberg an email with the subject line "My Work History Backstory," which Jackson sent in anticipation of a meet-and-greet meeting with Ms. Stoltenberg.  Ex. A, 126:18-128:15; **Exhibit M**, Ex. 14 to Jackson Dep.  In this email, Jackson stated that she wanted to share some background on her life that related to her current issues with anxiety and her feelings and fears because she felt it would help Ms. Stoltenberg understand her better as a person.  Ex. A, 128:16-20; Ex. M, at HIC000636-HIC000637.

40.    Jackson further stated that in her last three jobs she had "been unfortunately in serious legal battles in federal court for harassment, that I did come out victorious each and every time but this cloud seems to haunt me."  Ex. A, 128:24-130:18; Ex. M, at HIC000636-HIC000637.  She further noted that when she hears words like "HR, Occurrences, Corrective and Disciplinary Action," "I immediately thinks my job is over and I am being targeted and it's a personal attack etc… and then the anxiety starts."  *Id*.  Jackson noted that she has "a very long history with anxiety in the workplace."  *Id*.  Jackson further noted she had filed two harassment claims at a prior job

13

that were resolved in her favor, that she then filed an EEOC charge against her employer at her next job and that she won the claim – which allowed her to take her family to Paris for her 50th birthday. *Id*.

41. Jackson sent this email to Ms. Stoltenberg because she wanted a "fresh start," she "wanted to be transparent" and she wanted Ms. Stoltenberg to understand what "words are triggers." Ex. A, 130:20-131:8. Jackson shared her prior EEOC and harassment claims because she did not "want to go back there." Ex. A, 133:8-18. She did not believe she was making a threat to Ms. Stoltenberg in disclosing her prior claims. *Id*. Jackson feels that regardless of where she works she is subject to harassment and discrimination. Ex. A, 134:12-15.

42. On February 26, 2016, Ms. Stoltenberg acknowledged receipt of Jackson's email by stating, "Thanks for sharing this, LT. I appreciate it. We had a great talk in your 1x1 today! Please let me know if you ever need me for anything! ☺" Ex. A, 134:16-24; Ex. M, at HIC000635.

43. On February 26, 2016, Jackson and Ms. Stoltenberg had a one-on-one meeting via telephone, during which Ms. Stoltenberg told her that they would start fresh. Ex. A, 135:1-136:10. Ms. Stoltenberg further stated to Jackson that other people saw her style of management as military, that she would be hands-on and Jackson should expect her to be visible even though they were working from separate locations, and she would let Jackson know right away if they needed to discuss things. *Id*. Jackson was okay with what Ms. Stoltenberg was telling her about her management style. Ex. A, 136:11-15.

### i. On March 14, 2016, Ms. Bjarnarson and Jackson have a coaching and development session regarding phone manipulation

44. On March 14, 2016, Ms. Bjarnarson sent Jackson an email, copying Ms. Stoltenberg, in which she recapped a coaching conversation they had that day by telephone. Ex. A, 137:10-138:10; Ex. B, ¶¶22-23; **Exhibit N**, Ex. 15 to Jackson Dep., at HIC000738-HIC000739.

Ms. Bjarnarson recapped discussing multiple scenarios with Jackson that fell into the category of phone manipulation and that could not happen again. Ex. A, 138:23-139:7; Ex. B, ¶¶22-23. Ms. Bjarnarson then provided instructions to Jackson on: not using the release button to end calls, as calls would end on their own; not putting members on hold or allowing dead air prior to speaking with them; and not transferring calls back to the 800 number since the call would just be transferred to another teammate. Ex. A, 139:8-17; 141:11-15; 142:10-16; Ex. B, ¶¶22-23; Ex. N, at HIC000738-HIC000739. Ms. Bjarnarson also provided specific examples, including dates and times, where Jackson had engaged in call avoidances. Ex. A, 152:12-19; Ex. B, ¶¶22-23; Ex. N, at HIC000738-HIC000739. Ms. Bjarnarson further confirmed that during the coaching session Jackson had acknowledged engaging in the noted behavior but stated she had done so due to her anxiety and also to bring down her metrics, such as ACW and talk time. Ex. A, 143:11-21; Ex. B, ¶¶22-23; Ex N, at HIC000738-HIC000739. Ms. Bjarnarson noted that during the coaching session, Jackson agreed that engaging in the noted behavior was not appropriate and that Jackson told Ms. Bjarnarson that she would not continue such actions. Ex. A, 143:22-144:4; Ex. B, ¶¶22-23; Ex. N, at HIC000738-HIC000739. Jackson agreed at her deposition that she did make such statements to Ms. Bjarnarson during the coaching session. *Id*.

45.     Jackson felt that Ms. Bjarnarson was being "petty" in her email. Ex. A, 140:3-14. She felt that she had been told she would be transferred to create a non-hostile environment, yet they continued to "poke." *Id*. Jackson felt that Ms. Bjarnarson was not discriminating against her, but that she was harassing her because her job was being threatened. Ex. A, 153:11-22

46.     Yet, Jackson understood that hitting the release button could result in hanging up on a customer. Ex. A, 140:14-141:10. Jackson further acknowledged that she would put customers on hold or transfer them back to the 800 number when she had anxiety. Ex. A, 141:11-22;

142:10-143:10. Jackson felt that her behavior was "natural in a call center" and that Humana was "exaggerating" and "it's like [they're] looking." Ex. A, 153:16-22.

47.    In her March 14 email, Ms. Bjarnarson provided Jackson with ways to avoid the noted behavior, including: combining her breaks and her lunch into a one hour break to allow her to decompress, as suggested by Jackson's therapist; talking to her leaders when she felt anxious so they could help find alternative solutions; using FMLA when she had approved events; and working with the third-party administrator to determine if she could receive extra breaks as an accommodation due to her anxiety. Ex. A, 144:4-145:1; 146:10-23; Ex. B, ¶¶22-23; Ex. N, at HIC000738-HIC000739.

48.    According to Jackson, she spoke with Ms. Bjarnarson and they agreed that if Jackson felt anxiety before taking a phone call, she could take time away from her desk or go on a walk, and Jackson would record that time away from her desk as FMLA time. Ex. A, 151:24-152:6. Jackson used her FMLA time in this manner once it was approved, and while Jackson does not specifically recall how often she used FMLA "it was high during that time of approval." Ex. A, 152:7-8; 310:21-311:2

49.    On March 15, 2016, Jackson acknowledged Ms. Bjarnarson's email by stating that: she would reach out to her leaders if she felt episodic; she would think of ways to manage her breaks/lunch and request additional time off the phone when needed; she was sure the phone examples noted in Ms. Bjarnarson's email took place when she was not stable due to her illness; and she had been stressed out since January 7, 2016, when she was unable to go to the doctor without being threatened with a call to HR [about her attendance]. Ex. A, 154:9-156:1; Ex. B, ¶23; Ex. M, at HIC000736.

50.     To that responsive email, Jackson cut and pasted several emails and email subject lines (without the content of the emails) she had sent to Ms. Bernath, Ms. Ahrens, Mr. Worzala and Ms. Stoltenberg in January 2016 about her eye infection and in February 2016 about her anxiety.   Ex. A, 156:2-5; Ex. M, at HIC000736-HIC000737.   Jackson attached these emails because she felt they showed a pattern of harassment when she had low productivity due to her eye infection or medication.  Ex. A, 156:2-157:7.

> **j.     Jackson combines her lunch with her project time so she can have a one-hour period away from taking phone calls to help her deal with anxiety, and she is able to take up to 45 minute periods away from phone calls when she feels episodic**

51.     On March 21, 2016, Ms. Stoltenberg sent Jackson an email asking if she wanted to move forward with either combining her breaks and lunch into a one-hour break/lunch or taking a 15 minute break and combining her other break and lunch for a 45-minute period.   Ex. A, 163:3-167:23; **Exhibit O**, Ex. 16 to Jackson Dep.   On March 25, 2016, Ms. Stoltenberg and Jackson had a one-on-one coaching session and Ms. Stoltenberg memorialized the meeting.  Ex. A, 168:16-169:16; **Exhibit P**, Ex. 17 to Jackson Dep.   Ms. Stoltenberg confirmed that Jackson's breaks would be changing the following week to help with her anxiety and that Jackson had decided that "chunking" her lunch to her project time would be best.  Ex. A, 170:10-18; Ex. P. Project time is a 30-minute period of scheduled time away from the phone to complete work that could not get completed during ACW.  Ex. A, 170:19-171:11.

52.     After March 21, 2016 through the end of her employment, Jackson was also allowed to take up to 45 minute periods away from the phone whenever she notified Humana that she felt episodic.  Ex. A, 167:24-168:11.

      **k.**    **On March 25, 2016, Ms. Stoltenberg and Jackson have a coaching and development session in which phone manipulation and her performance against metrics was discussed**

53.     During a March 25, 2016 coaching and development session, Ms. Stoltenberg gave some positive feedback but also noted that she was seeing Jackson using "a lot of phantom after-call-work". Ex. A, 171:16-173:17; Ex. B, ¶27; Ex. P. She also reminded Jackson not to use the release button unless there was no response from a caller, otherwise the call would disconnect on its own, and noted that Jackson responded that this was a habit from working in other call centers. Ex. A, 171:16-173:17; Ex. B, ¶27; Ex. P. Ms. Stoltenberg noted that Jackson's call quality had taken "a dip" and that Jackson needed to timely review calls, to which Jackson responded that she was not doing so because it caused anxiety. Ex. B, ¶273; Ex. P. Ms. Stoltenberg further noted that Jackson had told her that she was having a hard time staying present and up to date on reading her emails. *Id.*

      **l.**    **Ms. Stoltenberg continues to coach Jackson about phone manipulation and her use of the release button to end member calls and Jackson claims she is being subject to harassment and discrimination**

54.     On March 28, 2016, Ms. Stoltenberg sent Jackson an email asking her to please discontinue using the release button, as she was continuing to do so even after it was discussed in the counseling session on March 25. Ex. A, 173:21-177:14; Ex. B, ¶28; **Exhibit Q**, Ex. 18 to Jackson Dep., at HIC 000744-HIC000745. Ms. Stoltenberg also referenced an email that she has sent to Jackson on March 17 in which she reminded Jackson that calls would disconnect on their own when they were completed and she did not need to physically "release" calls. Ex. Q, at HIC000746. Jackson responded that she was trying to correct the habit and did not realize that she continued to hit the release button, and that she had "never been told this was a problem before." Ex. A, 177:15-178:16, Ex. Q, at HIC000744. On March 31, 2016, Ms. Stoltenberg sent Jackson

an IM reminding her to really focus on not hitting the release button since she continued doing so. Ex. A, 178:20-179:16; Ex. B, ¶29.

55.     Jackson felt that Ms. Stoltenberg was harassing her by sending her the IM because Ms. Stoltenberg kept reminding her about not using the release button and documenting her reminders, and not giving Jackson an opportunity to really grasp making a change.  Ex. A, 179:14-181:19.  Jackson maintains that she told Ms. Stoltenberg that it made her uncomfortable to be continually reminded about the release button but Ms. Stoltenberg kept reminding her anyway. Ex. A, 182:12-17.

56.     Jackson felt she was being singled out because she asked her teammates if they used the release button and they said they did.  *Id*.  On March 31, 2016, Jackson sent an email to the teammates supervised by Ms. Stoltenberg and Ms. Bjarnarson stating that she "desperately" needed help in tips/suggestions on getting out of her habit of hitting the release button and asking how others overcame the urge to hit the release button.  Ex. A, 183:16-185:12; **Exhibit R**, Ex. 20 to Jackson Dep.  However, Jackson could not identify any teammate by name that told her they used the release button, nor did she provide any documents supporting that she received such responses.  Ex. A, 185:19-186:10.

57.     Ms. Bernath responded to Jackson's March 31 email asking for tips to break her habit, by noting there was softskill training available that she could access via an audio book on breaking habits and that team leadership could help find phone coverage so she could have time to listen to the applicable chapters.  Ex. A, 186:11-187:14; Ex. R.  Jackson agrees Ms. Bernath was trying to help her with this response.  *Id*.  Jackson was given time to listen to the chapters and she found them helpful.  Ex. A, 188:3-15.

58.     Jackson "100 percent" agrees that Ms. Stoltenberg had the right to performance manage her.  Ex. A, 183:10-12.  Jackson believes that Ms. Stoltenberg had "every right to come to my desk every 15 seconds [because] there's no law against that" but she felt it made a hostile work environment.  Ex. A, 208:6-209:4.  Jackson testified that "[T]here's no law against poor management."  Ex. A, 133:23-24; 182:23-183:1.  Jackson agrees that Humana could talk to her about her performance but she felt it was unfair for them to talk to her and imply that she was weak in her role when her teammates were only pretending to be strong in their roles.  Ex. A, 213:8-24.

59.     On April 4, 2016, Jackson sent an email to Ms. Bjarnarson with the subject, "Confidential and Private/Harassment/Discrimination Claim/Release Button."  Ex. A 188:19-189:23; Ex. B, ¶32; **Exhibit S**, Ex. 21 to Jackson Dep., at HIC000818-HIC000819.  Jackson stated that she was "again feeling mishandled and forms of micro-management, harassment and discrimination during this transition period from Abbey's team to Jen's team."  Ex. A, 190:15-191:6; Ex. B, ¶32; Ex. S, at HIC000818-HIC000819.  Jackson stated, "This all stems from recent activities of Jen's management style, I understand we are still learning each others [sic] personality but I cannot go another day without bringing this to your attention because I do not want to escalate to HR."  *Id.*

60.     Jackson continued her email by noting her belief that she was being treated differently because her teammates were using the release button, and she was the only one "being watched hourly and receiving these reminders from leadership about hitting the release button."  Ex. A, 194:20-195:11.  Jackson noted this was causing her anxiety/stress.  Ex. S, at HIC000818-HIC000819.  Jackson asked that Ms. Bjarnarson acknowledge "that leadership will not continue these actions, and recognize it is not the appropriate action to take."  Ex. S, at HIC000818-HIC000819.  Jackson further noted that she did not want to discuss her email due to high anxiety

and she did not want to trigger a panic attack.  Ex. A, 196:16-197:24; Ex. S, at HIC000818-HIC000819.

61.     Ms. Bjarnarson responded to Jackson by stating, "I want you to know that your concerns are taken seriously, and I suggest you report them to HR4U."  Ex. A, 197:2-13; Ex. S, at HIC000818.  Although Jackson stated that she would reach out to HR right away, she did not do so.  Ex. A, 197:14-198:3; Ex. B, ¶33; Ex. S, at HIC000817-HIC000818.

62.     According to Jackson, on or about April 4, 2016, she had a conversation with Ms. Stoltenberg in which they discussed Jackson's performance and Ms. Stoltenberg told Jackson that she was watching everyone's performance but that Jackson was the one she was monitoring on a day-to-day basis because she stood out more than most.  Ex. A, 158:3-159:4.  Jackson claims that she responded by saying, "I thought we were starting brand-new."  To which, Ms. Stoltenberg responded, "This is my style of management, and I have every right to micromanage you if I see something I don't like."  Ex. A, 159:13-22.

63.     Jackson agrees that Humana had a right to coach her but maintains they knew she was "fragile", "emotional," "wounded" and had anxiety, so they kept "poking" her.  Ex. A, 160:11-22.  Jackson agrees that it appeared her productivity was low but they should have known her productivity was low because she was off the phone more than normal with her FMLA use.  Ex. A, 160:23-161:6.  Jackson further agrees that the coaching she received on March 14, 2016 was not about productivity, but how she treated customers when handling calls.  Ex. A, 161:7-16.  However, Jackson maintains that how she handled calls was because of her anxiety.  *Id*.

64.     On April 5, 2016, Jackson forwarded the emails between her and Ms. Bjarnarson to Ms. Stoltenberg and noted that she had not reached out to HR.  Ex. S, at HIC000813.  Ms. Stoltenberg responded by clarifying that her emails and IMs to Jackson were only reminders to her

21

as a follow-up to coaching, and she felt that reminding her would help Jackson break the habit of releasing calls. Ex. A, 203:6-205:12; Ex. S, at HIC000812-HIC000813. Stoltenberg further clarified that she was sorry that it caused Jackson anxiety. *Id*.

65. Jackson is not aware of any teammate reporting to Ms. Stoltenberg or Ms. Bjarnarson that incorrectly used the release button in the same manner that Jackson did. Ex. A, 195:21-196:2. Jackson is also not aware of any teammate reporting to Ms. Stoltenberg or Ms. Bjarnarson that engaged in the same amount of hitting the release button that she did. Ex. A, 195:8-11. Jackson is not aware of any teammate reporting to Ms. Stoltenberg or Ms. Bjarnarson that Ms. Stoltenberg or Ms. Bjarnarson suspected in engaging in call avoidance. Ex. A, 196:12-15.

### m. Jackson is placed on a Performance Improvement Plan

66. On April 14, 2016, Jackson was placed on a Performance Improvement Plan ("PIP"). Ex. A, 216:14-21; Ex. B, ¶34; **Exhibit T**, Ex. 22 to Jackson Dep. Ms. Stoltenberg delivered the PIP over the phone with Ms. Bjarnarson, while John Kolet, Director of Consumer Service Operations, was present with Jackson in Chicago. Ex. A, 216:22-218:7; Ex. B, ¶34.

67. Jackson does not recall much from the meeting because she had a "very intense anxiety attack" but she recalls that they spoke to her about the PIP, that she disagreed with it and that she informed them that she would not sign it. Ex. A, 218:4-220:17. Jackson also recalls that she told Ms. Stoltenberg that she did not recall engaging in any of the behaviors or performance deficiencies outlined in the PIP and that if she did so it was related directly to her anxiety. Ex. A, 218:8-15.

68. The PIP sets forth that Jackson had ongoing coaching and development sessions, including on December 21, 2015, March 14, 2016, and March 25, 2016, but her performance continued to fall below expectations. Ex. A, 220:13-17; 248:6-16; Ex. B, ¶34; Ex. T. The PIP further set forth specific dates from recent routine call monitoring where there were issues with

Jackson either not greeting callers at the beginning of calls or releasing calls with customers before they were completed. Ex. B, ¶34; Ex. T. The PIP noted that Jackson's behavior gave the appearance of phone manipulation and that call avoidance is considered a critical offense under Humana's policies and procedures. *Id*.

69. The PIP set forth that Jackson was to: have no additional instances of improper conduct or behavioral issues; not hit the release button before fully servicing the member and when the member was finished speaking; greet members immediately at the start of the call with no dead air; handle calls completely and only transfer callers when necessary; and not engage in behavior or conduct that was detrimental to customer service. Ex. B, ¶35; Ex. T. Further, Jackson was informed that any appearance of phone manipulation would not be tolerated. *Id*.

70. Although the PIP was to continue through October 11, 2016, the PIP informed Jackson that if she did not meet expectations during the PIP, she could be immediately terminated. *Id*.

71. Jackson believes that Humana honestly believed she was engaging in the conduct set forth in the PIP. Ex. A, 221:21-222:1.

**n.      Jackson requests to be placed temporarily in a non-calls role**

72. On April 14, 2016, Ms. Stoltenberg emailed Jackson a copy of the PIP, along with audio recordings of the calls mentioned in the PIP. Ex. A, 223:11-224:18; **Exhibit U**, Ex. 23 to Jackson Dep., at HIC000930. On April 15, 2016, Jackson responded to Ms. Stoltenberg, copying Ms. Bjarnarson and Mr. Kolet, by stating, "Due to mental capacity, stress level and anxiety in response to recent job status (Lieu of Termination) I am requesting in good faith to be temporarily placed in a non-calls roll [sic]. I am unable to concentrate and have no memory of the recent acts stated in the performance plan and do not want to cause any further harm to my employment status

23

nor to the members [sic] experience. I thank you in advance for your support during this very fragile and difficult time." Ex. A, 224:19-225:19; Ex. B, ¶36; Ex. U, at HIC000929.

73. Jackson maintains that in making this request she was seeking a processing position. Ex. A, 225:20-226:5. Jackson is not aware of whether there were any openings in the processing position at the time she made her request. Ex. A, 227:20-24.

74. Ms. Bjarnarson responded to Jackson the same day, stating that her request would be reviewed but, in the meantime, she would be taken off the phones for her shift on April 15. Ex. A, 228:1-18; Ex. B, ¶36; Ex. U, at HIC000927. Later in the afternoon on April 15, Ms. Bjarnarson emailed Jackson noting that Humana would allow her to continue being off the phones for the day but that she would need to perform her role of taking calls as of Monday (her next shift) and going forward. Ex. A, 229:20-230:9; Ex. B, ¶40; Ex. U, at HIC000927-HIC000928.

75. Jackson has no knowledge why her request for a temporary non-calls role was denied. Ex. A, 230:21-24. However, Humana denied the request because Jackson had temporarily performed some functions of the Processor role and was not successful in completing the functions, and the role required concentration which Jackson stated she did not have the ability to do. Ex. B, ¶39. Jackson was approved for FMLA at the time that her request was denied but she opted not to use an FMLA to be away from her calls role. Ex. A, 231:1-18.

      o. **Jackson refutes her PIP and contacts HR4U alleging that she is being subjected to harassment and discrimination**

76. On April 15, 2016, after being informed that her request was denied, Jackson sent an email to Ms. Bjarnarson, Ms. Stoltenberg and Mr. Kolet noting that she had filed a claim with HR4U and the EEOC. Ex. A, 231:19-232:9; Ex. B, ¶40; Ex. U, at HIC000927. On April 15, 2016, Jackson also sent Ms. Stoltenberg a memorandum appealing the PIP and alleging that she had been

24

subjected to constant discrimination, workplace bullying and constant negative feedback.  Ex. A, 245:2-249:2; **Exhibit V**, Ex. 24 to Jackson Dep.

77.     In her appeal, Jackson associated her performance issues with her anxiety.  Ex. A, 249:3-7; Ex. V.  She cited to §825.123 of the ADA and highlighted the words "unable to perform any one of the essential functions" of the employee's position, because her illness was unpredictable and she was explaining that "you can become unable to perform your function."  Ex. A, 250:1-22.  Jackson testified that, at times when she became anxious, she was "absolutely" unable to perform any of the essential functions of her position and she would have to leave the phone to deal with that episode.  Ex. A, 250:23-251:3; 309:15-18; 311:3-10.  FMLA paperwork completed by Jackson's physician also states that Jackson was unable to perform all job duties when she was having an anxiety episode.  Ex. A, 308:24-309:18; **Exhibit W**, Ex. 33 to Jackson Dep.  From the beginning of January 2016 until her employment ended in May 2016, Jackson estimates that she had anxiety attacks at least twice a week, if not more, where she could not talk on the phone and would need to calm down.  Ex. A, 311:3-24.

78.     On April 15, 2016, Jackson also sent a copy of her appeal to HR4U and on April 19 she emailed HR4U and asked to update her previous email to include retaliation.  Ex. A, 254:23-256:16; 261:13-262:18; **Exhibit X**, Ex. 25 to Jackson Dep.; **Exhibit Y**, Ex. 26 to Jackson Dep. Via letter dated April 25, 2016, Paulette Daniel, Human Resources, informed Jackson that she had objectively considered her concerns and all of the documentation relative to her PIP and found that the PIP was appropriate and followed Humana's performance expectations because Jackson was placed on a PIP for call avoidance and disconnecting members; leadership had asked her not to use the release button to help her stop hanging up on members; and the PIP was based on her performance and not due to her FMLA leave.  Ex. A, 263:22-265:3; **Exhibit Z**, Ex. 27 to Jackson

Dep. Ms. Daniel further addressed Jackson's concern about her requests for time off being counted as occurrences and Ms. Daniel reiterated that Jackson's department followed Humana's attendance policy and that Jackson's leadership confirmed that she did not have any current attendance issues and was not on the PIP regarding attendance. Ex. Z.

79. On April 30, 2016, Jackson emailed Ms. Stoltenberg and requested audio copies of each call mentioned in her PIP and Ms. Stoltenberg provided copies. Ex. A, 270:20-277:19; Ex. B, ¶41; **Exhibit AA**, Ex. 29 to Jackson Dep. On May 2, 2016, Jackson emailed Ms. Stoltenberg (copying Ms. Bjarnarson and Mr. Kolet) her comments on the recordings – in which she explained why she did not believe she had engaged in call manipulation – and stated that she did not wish to continue discussing it any further due to stressors/triggers/attacks. *Id*. Jackson also sent a copy of this email to HR4U. Ex. A, 280:12-282:24; Ex. B, ¶41; Ex. AA. Ms. Stoltenberg forwarded the May 2 email from Jackson to Mr. Kolet and Ms. Bjarnarson, stating that she was not planning on responding based on Jackson expressing that she did not want to discuss it further, and noting that she had also emailed HR with more recent examples of potential phone manipulation by Jackson that she was waiting to hear back on. Ex. B, ¶41; Ex. AA.

### p. Jackson is terminated on May 16, 2016

80. On May 16, 2016, Ms. Stoltenberg spoke with Jackson by telephone and informed her that her employment was terminated, which was memorialized in a termination document. Ex. A, 284:4-290:15; Ex. B, ¶48; **Exhibit BB**, Ex. 31 to Jackson Dep. A representative from HR was also on the phone and Mr. Kolet was present with Jackson. Ex. A, 285:2-20. Ms. Stoltenberg and Mr. Kolet attempted to explain to Jackson why she was being terminated but she cut them short and told them that she was feeling anxious and requested to leave. Ex. A, 287:9-20. Mr. Kolet attempted to give Jackson a copy of the termination document, but she would not take it and instead saw it when she received a copy of her personnel file. Ex. A, 287:21-288:6. The

termination document reflects that since the coaching sessions and PIP, Jackson's performance continued to fall below expectations, and included examples of additional calls after receiving the PIP that did not meet expectations and reflected call manipulation. Ex. A, 289:2-10; Ex. B, ¶48; Ex. BB.

**DATED:**     September 3, 2020                                  Respectfully submitted,

                                                    By:   _/s/_ Jennifer L. Colvin
                                                          One of the Attorneys for Defendant
Jennifer L. Colvin (ARDC No. 6274731)                     **HUMANA INSURANCE COMPANY**
**OGLETREE, DEAKINS, NASH,**
  **SMOAK & STEWART, P.C.**
155 North Wacker Drive, Suite 4300
Chicago, Illinois 60606
Telephone: 312.558.1220
*jennifer.colvin@ogletree.com*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on September 3, 2020, the foregoing ***Defendant's Local Rule 56.1 Statement of Material Facts to Which There Is No Genuine Dispute*** was filed electronically with the Clerk of the U.S. District Court for the Northern District of Illinois using the CM/ECF system, which sent notification of such filing to all parties of record.

 /s/  Jennifer L. Colvin
One of the Attorneys for Defendant
**HUMANA INSURANCE COMPANY**

44017070.1